**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIZABETH SCHAEFER, individually and on behalf of all others similarly situated,<br><br>   *Plaintiff,*<br><br>v.<br><br>DELTA DENTAL OF NEW YORK, INC., and DELTA DENTAL OF CALIFORNIA,<br><br>   *Defendants.* | Case No. 2:26-cv-1549<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Elizabeth Schaefer brings this class action lawsuit on behalf of herself and all others similarly situated against Delta Dental of New York, Inc. ("DDNY") and Delta Dental of California ("DDCA," and together with DDNY "Delta Dental" or "Defendants") and alleges, upon personal knowledge as to her own actions and experiences, her counsel's investigation and upon information and belief as to all other matters, as follows.

### INTRODUCTION

1. DDNY provides medical insurance to Plaintiff and other New York residents.

2. DDNY is part of the DDCA enterprise, and both companies are managed by DDCA's centralized executive team. The company is comprised of DDCA, DDNY, and various other regional business units, which collectively provide health care benefits to more than 45 million people across 15 states and the District of Columbia.

3. DDNY and DDCA share a common website and related mobile application (the "Website"), on which plan members can communicate with Delta Dental and access and manage plan benefits, including to identify in-network healthcare providers that meet the plan members' specific needs.

4.      It is unlawful for health insurers, like Delta Dental, to disclose the personal health information ("PHI" or "Private Information") of its plan members without informed consent and express written authorization.

5.      Plaintiff and other plan members who visited and used Delta Dental's Website understandably thought they were communicating *only* with their trusted health plan.

6.      Unbeknownst to Plaintiff and other plan members, Delta Dental embedded several tracking technologies on the Website that automatically intercepted and disclosed plan member communications with Delta Dental to several third-party advertising and analytics companies, including Google, Adobe, Datadog and Qualtrics.

7.      Delta Dental embedded these technologies into the Website in order to gain additional insights on its plan members, improve its return on marketing spend, and, ultimately, increase its revenues.

8.      Operating as designed and as implemented by Delta Dental, the tracking technologies allowed the Private Information that Plaintiff and Class Members provided to Delta Dental to be unlawfully disclosed to Adobe, Google, Datadog, and Qualtrics alongside unique and persistent identifiers that identify the plan member in a manner that violates federal and state law.

9.      By installing the tracking technologies, Delta Dental effectively planted a bug on Plaintiff's and Class Members' devices and compelled them to unknowingly disclose their private, sensitive and confidential health-related data and communications with Delta Dental to Adobe, Google, Datadog, and Qualtrics. Those communications include plan member requests that identify (a) the individual Website user as a Delta Dental plan member, (b) the type of health plan in which they were members, (c) that they were seeking treatment for oral healthcare from dentists located near their address or zip code, (d) the type of dentist they were considering, (e) keywords that they typed in to specifically query Delta Dental about, and (f) details about that dentist that

2

the plan member told Delta Dental were important to them (*e.g.*, gender, language spoken, board-certification).

10.     This type of Private Information is, in turn, simultaneously intercepted by Adobe, Google, Datadog, and Qualtrics that use it to create fulsome and robust profiles for the purposes of retargeting and future marketing, among other business purposes that benefit the third-party service providers.

11.     Plan members simply do not anticipate that their trusted health plan sends personal health information or confidential medical information collected via its Website to any undisclosed third party – let alone technology providers, such as Google, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue – without the plan members' informed and express consent.

12.     Neither Plaintiff nor any other Class Member were provided, much less signed, a written authorization permitting Delta Dental to disclose their Private Information to Adobe, Google, Datadog, and Qualtrics or any third-party service provider. Worse, Delta Dental informed Plaintiff and Class Members it would *not* disclose protected health information without authorization.

13.     Despite willfully and intentionally incorporating the tracking technologies into the Website, Delta Dental has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with Adobe, Google, Datadog, and Qualtrics.[1]

---

[1] In contrast to Defendant, several medical providers which have installed similar tracking technologies on their web properties have provided their plan members with notices of data breaches caused by the technology transmitting PHI to third parties. *See*, *e.g.*, *Advocate Aurora says 3M plan members' health data possibly exposed through tracking technologies* (Oct. 20, 2022), available at https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3 (last visited Feb. 20, 2026); *Novant Health notifies plan members of potential data privacy incident* (Aug. 19, 2022), available at

14.     Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Adobe, Google, Datadog, and Qualtrics as they communicated with Delta Dental via its Website.

15.     The disclosure of Plaintiff's and Class Members' Private Information via tracking technologies contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how covered entities, such as health plans, must safeguard and protect Private Information.

16.     Simply put, further to the HIPAA Privacy Rule, covered entities such as Delta Dental are **not** permitted to use tracking technology tools in a way that exposes plan members' Private Information to any third-party without express and informed consent from each patient.

17.     Lest there be any doubt of the illegal nature of Delta Dental's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[2]

18.     Similarly, the FTC addressed also addressed these privacy concerns:

---

https://www.prnewswire.com/news-releases/novant-health-notifies-patients-of-potential-data-privacy-incident-301609387.html (last visited Feb. 20, 2026).

[2] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Feb. 20, 2026) (emphasis removed and added).

In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out***.[3]

19.     Delta Dental further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that plan members exchanged with Delta Dental. Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiff's and Class Members' Private Information, Delta Dental assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

20.     Delta Dental has not disclosed to Plaintiff or Class Members that it shares plan members' sensitive and confidential communications with Adobe, Google, Datadog, and Qualtrics.

21.     As a result, Plaintiff and Class Members were unaware that their PII and PHI were being surreptitiously transmitted to Adobe, Google, Datadog, and Qualtrics as they communicated with their health plan.

22.     Delta Dental breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web based technology to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web users' information; (iii) failing to obtain the consent of Plaintiff and Class Members to disclose their PII and PHI to Adobe, Google, Datadog, and Qualtrics or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' PII and PHI through the tracking technologies; (v) failing to warn Plaintiff and Class Members; and (vi)

---

[3] Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, the FTC Business Blog (July 25, 2023) (emphasis added))

otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient PII and PHI.

23. Plaintiff and Class Members have suffered injury as a result of Delta Dental's conduct; these injuries include: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) compromise and disclosure of Private Information and identities, (iv) loss of value of their Private Information, (iv) violations of statutory rights and related statutory damages, and (v) the continued and ongoing risk to their Private Information.[4]

24. Plaintiff seeks to remedy these harms and therefore assert causes of action for (i) Breach of Contract; (ii) Breach of Confidence; (iii) Violation of New York's Deceptive Trade Practices Act (New York Gen. Bus. Law §§ 349, 350); and (iv) Violation of the Wiretap Act (18 U.S.C. § 2510, *et seq.*).

**PARTIES**

25. Delta Dental of New York, Inc. is a non-profit entity with its principal place of business at One Delta Drive, Mechanicsburg, PA 17055.

26. Delta Dental of California is a nonprofit, mutual benefit corporation, organized under the laws of the State of California, with its principal place of business at 560 Mission Street, Suite 1300, San Francisco, CA 94105.

27. DDNY and DDCA are part of a consolidated health insurance enterprise, managed by a centralized executive team at DDCA, that provides oral health care benefits to more than 45 million people across 15 states, including New York. DDNY and DDCA share common administrative functions, including the Website at issue in this case, which is operated for the

---

[4] The exposed Private Information of Plaintiff and Class Members can—and likely will—be further disseminated to additional third parties utilizing the data for retargeting.

benefit of all Delta Dental plan members, including those, like Plaintiff, whose plans are administered by DDNY.

28.    Plaintiff Elizabeth Schaefer is a natural person and a citizen of the State of New York. Plaintiff is a DDNY plan member. Plaintiff logged into her Delta Dental portal on the Delta Dental Website and was authenticated as a plan member from her device and thereafter used the Website to access and manage plan benefits, including to look for dentists located near her by inputting location information and her plan type.  Further to the systematic process described herein, Delta Dental assisted Adobe, Google, Datadog, and Qualtrics with intercepting Plaintiff's communications, including those that contained personally identifiable information, protected health information and related confidential information. Delta Dental assisted these interceptions without Plaintiff's knowledge, consent or express written authorization.

**JURISDICTION & VENUE**

29.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States, and under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants.

30.    This Court has personal jurisdiction over Defendants because they provide health insurance for New York residents, operate the Website for the benefit of plan members in New York, specifically targeted the Website at New York residents, knew that New York residents regularly used the Website to access and manage plan benefits from their locations in New York, caused tracking technologies to be installed on New York residents' computers located in New York, and facilitated the surreptitious disclosure of plan member PHI from those New York based computers to third-parties located around the country.

31.     Venue is proper under 18 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## COMMON FACTUAL ALLEGATIONS

**A.      *Background on Web Browsers, Source Code, & Tracking Technologies.***

32.      Web browsers are software applications that allow consumers to exchange electronic communications over the Internet.

33.     Internet users use web browsers (and/or mobile applications) to send, receive, and view electronic communications on the Internet.

34.     Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

35.     The communications between a user and the website host begin when the user arrives at the intended website. The communications continue as the user navigates the website. The communications end when the user closes their browser or goes to an unrelated website. Communications restart if a user returns to the website.

36.     When a user navigates to a website on a web browser, the user's browser sends a communication called a "GET request" to the web server, which contains instructions on the content being requested for viewing by the web browser.

37.     Upon receipt of the GET request, the web server sends a responsive communication called a "POST request" to the web browser, which contains the content requested and instructions to the web browser regarding how to display that content on the user's computer.

38.     The original GET and POST request includes the webpage's Universal Resource Locator ("URL") and metadata, including the user's IP address and "user agent" information describing the hardware and/or software responsible for retrieving the requested content, such as the device, operating system and web browser.

39.     In addition to exchanging the above communications with users' computers, website owners may also choose to embed tracking technologies (often referred to as "cookies" or "tracking pixels" or "beacons") on the website. Where tracking technology is embedded on a website, it is sent from the web server to the user's computer when the user navigates to the website. Once installed on the user's computer, it intercepts the user's communications with the website and sends them to the third-party vendor that created and provided the tracking technology, alongside one or more unique identifiers that the vendor can use to identify the website user.

40.     Tracking technologies are often created and provided by third-party marketing and analytics companies, like Google, Adobe, Datadog, or Qualtrics. The third-party marketing and analytics companies use the intercepted communications to track users' online activities to create detailed profiles of their interests so that they can be targeted with "relevant" marketing across the internet and otherwise to power the sales, marketing, and advertising of the host company (here, Delta Dental).

41.     These technologies include small files that the website places on the user's device to collect data about the user's online activity. They work by assigning or associating the user with a unique identifier, storing that identifier with other information about the user (*e.g.*, geographic location, device specifications, etc), gathering data on the user's activity on the website in real time, and transmitting that data to the host website and the third-party technology vendor.

42.     Tracking technologies effectively open a spying window through which the tracking technologies funnel data about users and their actions with the host website to third parties in real time from the user's device. It is akin to placing a bug at the point of origin of a call, which causes the communication with the intended recipient, in this case, Delta Dental, to be simultaneously, contemporaneously, live, and in real time transmitted to the tracking technology provider (in this case, Adobe, Google, Qualtrics and Datadog).

43.     The transmission of tracking technology from a website to a users' computer is surreptitious, and thus website users do not know when a website has caused tracking technology to be installed on their computers. Thus, without any knowledge, authorization, or action by a user, a website can install tracking technology on a user's computer and cause the device to contemporaneously and invisibly direct the users' personally identifiable non-public medical information and communications to third parties.

44.     When a user accesses a website hosting a tracking technology, the tracking technology is surreptitiously sent to and installed on the user's device and thereafter transmits the users' communications with the website to the third-party technology provider.

45.     This secret transmission to the third-party technology provider contains the communications exchanged between the website user and the host website (*e.g.*, the "GET request" and a "POST request"), along with additional data that the tracking technology is configured to collect (*e.g.*, unique identifiers that allow the technology providers to associate the collected data with the individual website user).

46.     The tracking technology is configured to collect specific aspects of the communication with the host website (and not 100% of the information exchanged between the user and the website). To achieve this end, the tracking technology reads the entire contents of the communication with the host website while it is occurring and collects the parts of the communication that it is configured to collect (*e.g.*, IP address and URL). The relevant parts of the communication are then bundled with a unique identifier and transmitted to the tracking technology vendor.

47.     The transmission to the third-party vendor is initiated by a tracking tool's code that lives on the user's device and occurs in real time while the user is communicating with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and

read the host website—the website host's own code (which communicates with the user's web browser to deliver the requested web content), and a tracking tool's code (which captures those communications and combines them with other information about and identifying the user). Thus, the tracking tool intercepts the communications on the website user's computer, in real time, while the user is actively communicating with the website.

48.     Thus, without any knowledge, authorization, or action by a user, a website developer like Delta Dental can deploy tracking technology onto user's devices that commandeers the device and contemporaneously and invisibly directs the users' communications with the website to third parties.

49.     Once the third-party technology vendor collects the information contained in the website user's communications with the host website, the third-party can store and use the information for various purposes of their own, including pecuniary purposes and facilitating targeted advertising.

50.     On a technical level, that is how the tracking technology Delta Dental installed on the Website deployed to intercept Plaintiff and the Class's communications with Delta Dental.

**B.     *How Delta Dental Discloses Class Members' Protected Health Information and Assists with Intercepting Communications.***

51.     Delta Dental operates the Website, on which plan members can communicate with Delta Dental and access and manage plan benefits.

52.     Plan members can access the Website via a web browser at the following URL: https://www1.deltadentalins.com/

53.     Unbeknownst to Plaintiff and other plan members, Delta Dental installed tracking technologies offered by Google, Adobe, Datadog, and Qualtrics (collectively, the "Tracking Technologies") on the Website for marketing purposes.

54. Google and Adobe are household names. Both companies operate large marketing and analytics businesses driven by online data collection, and both companies collect information on individuals' online activity, compile that information into profiles of individuals' interests and activities, and use that information to target individuals with advertising across the internet.

55. Datadog is a monitoring and analytics platform that, among other things, monitors users' interactions with websites and provides analysis and visualization tools to its clients.

56. Qualtrics is an online platform designed for experience management, primarily focused on gathering and analyzing data related to customer experiences.

57. The Website contains both unauthenticated (*i.e.*, public) pages, as well as an authenticated patient portal that plan members log into using a name and password.

58. Delta Dental installed the Tracking Technologies on both the unauthenticated and authenticated pages of its Website.

59. When a Delta Dental plan member navigated to the Website, the Tracking Technologies were surreptitiously installed on their devices by the server hosting the Website.

60. Once installed on a plan member's device, the Tracking Technologies secretly intercepted the user's communications with the Website in real time and transmitted that information to the third-party technology vendors.

61. Plaintiff will illustrate how the tracking technologies operate on Delta Dental's Website with reference to Google's tracking technologies.

62. Delta Dental installed tracking code on its Website associated with Google Ads, Google Doubleclick Ads, and Google Analytics (hereinafter, "Google Tracking Technologies").

63. Upon navigating to the Website, the Google Tracking Technologies are automatically and surreptitiously installed on the user's device.

64.    When a user logs into their account on the Website, their device sends a communication to Delta Dental's web servers containing their request to be admitted to the portal, and the web server responds with a request that the device post the in-portal content. The Google Tracking Technologies intercept those communications and send them to Google, thus revealing to Google that the individual has successfully logged in to the plan member portal and is thus a Delta Dental plan member.

65.    By virtue of the Google Tracking Technologies, the plan member's device also shares with Google two cookies: the _ga and _Secure-3P session cookies. These cookies contain a Google Client ID. Google Analytics uses this Client ID to associate the collected activity with the individual user and connect hits from the same plan member into sessions and to track that individual's behavior across multiple visits to Delta Dental's and other websites.

66.    Once inside the plan-member portal, the user can access and manage their plan benefits, including to search for in-network medical providers.

67.    The Website prompts plan members to request that Delta Dental help them "find a dentist" by searching either by location or type of insurance plan network.

68.    Here is an example of what the plan member might see.



69. When the plan member inputs her personal information and communicates with Delta Dental that the plan member wants to find a dentist that meets their desired criteria, Delta Dental returns the results of the query with information about conforming dentists within the members' plan located near the member.

70. The Google Tracking Technologies capture these communications and send them to Google. The information sent to Google reveals that the plan member asked Delta Dental to help her "find a dentist," her address, city, or zip code, and her type of insurance network (*e.g.*, ppo). Google also received the user's IP address; the type of browser, device, and operating system (called user-agent data); the time it was sent (called a timestamp); and the Google Client ID.

71.     As the plan member refines her search parameters, each request to Delta Dental to refine the search parameters is also communicated to Google.

72.     For instance, the plan member could filter her search by whether the dentist is accepting new patients, their provider specialty (e.g., pediatrics), the type of specialized care offered (e.g., treats children), languages spoken, extended office hours, office access, board-certification, and the gender of the dentist. Each of these search parameters that the plan member communicates to Delta Dental is *also* intercepted by and sent to Google.

73.     If a plan member communicates to Delta Dental keywords that are important to her search, such as "crown," the exact keywords that the plan member communicated to Delta Dental are also communicated to Google.[5]

74.     Each of these communications is accompanied by the plan member's: IP address; device / browser identifiers; URLs; and other unique identifying numbers.

75.     As the plan member navigates around the portal, their communications with Delta Dental related to each page therein are similarly intercepted and disclosed to Google.

76.     The interceptions occur on the user's device and occur while the user is actively communicating with the website. The tracking technology reads and learns the contents of the communication while it is happening, collects the relevant subset of the information it is configured to collect, and discloses those contents to the tracking technology vendor in real time.

77.     After the tracking technology sends the communication to the third-party vendor, it is stored on the vendor's servers and can be further used by the third-party vendor for its own purposes.

78.     The Tracking Technologies created by Adobe, Data Dog and Qualtrics function in a similar way and intercept similar information.

---

[5] The Website has a similar "find a dentist" feature on the unauthenticated pages, outside of the portal, and the tracking technology on the Website discloses plan member communications made on that page in the same manner.

79.     The Tracking Technologies allow the Tracking Technology Vendors to know the content of plan members' communications with Delta Dental through the Website that relates to the plan members' health insurance and medical care.

80.     This is precisely the type of information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of plan members.[6]

81.     Plaintiff's and Class Members' identities could be easily determined based on the Google Client ID, IP address and/or from the collection of other identifying information that was improperly disclosed.

82.     After intercepting and collecting this information, the Tracking Technology Vendors store it, analyze it, and assimilate it into datasets and use it for their own benefit, including to target the plan member with targeted advertising.

83.     By installing and implementing the Tracking Technologies, Delta Dental caused Plaintiff's and Class Members' communications to be intercepted and transmitted to Google, Adobe, Datadog, and Qualtrics via their Tracking Technologies.

84.     Delta Dental's conduct was knowing and intentional.

85.     Upon information and belief, the third-party vendors disclosed the Tracking Technologies' functionality to Delta Dental prior to Delta Dental's decision to embed the technologies on the Website.

86.     Delta Dental's knowledge is further demonstrated by the fact that Delta Dental has installed the Facebook Tracking Pixel (another type of tracking technology) on its Website, *but* it has truncated and otherwise removed descriptive information from the pages associated with finding a dentist so that the medical information is obscured when it is communicated to Facebook via the Facebook Tracking Pixel. In contrast, Delta Dental did *not* truncate and otherwise remove descriptive information from the pages associated with finding a dentist so that the medical information is obscured when it is communicated to the Tracking Technology Vendors.

---

[6]     *See*          https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Feb. 20, 2026).

87.    Through the Tracking Technologies, Delta Dental shares its plan members' identities and information related to their private medical treatment.

88.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Delta Dental to disclose their personally identifiable information and protected health information; nor did they authorize Delta Dental to enable third-party marketing companies to intercept their communications with Delta Dental. Plaintiff and Class Members were never provided with any written notice that Delta Dental disclosed its plan members' protected health information, nor were they provided any means of opting out of such disclosures. Despite this, Delta Dental knowingly disclosed Plaintiff's protected health information to the Tracking Technology Vendors.

89.    By law, Plaintiff and Class Members are entitled to privacy in their protected health information and confidential communications. Delta Dental deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, personally identifiable information, and protected health information to a third party; (ii) disclosed plan members' protected information to the Tracking Technology Vendors – unauthorized third-party eavesdroppers; and (iii) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

90.    Because the Tracking Technologies are surreptitiously installed on user's devices without consent, and operate in the code running in the background on user's devices, Plaintiff did not discover that Delta Dental disclosed her personally identifiable information and protected health information to the Tracking Technology Vendors, and assisted those Providers with intercepting her communications with Delta Dental, until approximately shortly before the Complaint was filed.

C.    *Delta Dental Violated HIPAA.*

91.    Plan member health care information in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by the HHS.

17

92.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[7]

93.    The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

94.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

95.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2)(i) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A. Names;

---

[7] HHS.gov, Health Information Privacy (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

\*\*\*
H. Medical record numbers;
\*\*\*
J. Account numbers;
\*\*\*
M. Device identifiers and serial numbers;
N. Web Universal Resource Locators (URLs);
O. Internet Protocol (IP) address numbers; … and
R. Any other unique identifying number, characteristic, or code…; and

(ii) the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

96. In a Health and Human Services' Health Information Privacy Bulletin ("HHS Privacy Bulletin"), Health and Human Services ("HHS") confirmed that HIPAA's protections apply to regulated entities' use of tracking technologies on webpages, such as Delta Dental's use of the Tracking Technologies on its Websites and related subpages.[8] Specifically, HHS explained that "Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage."[9]

97. The HIPAA Privacy Rule requires any "covered entity"—which includes health plans liked Delta Dental—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

---

[8] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept' of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html ("HHS Privacy Bulletin").
[9] *Id.*

98.    An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

99.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Delta Dental when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

100.    Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

### i.    *Plan member status is among the health information protected by HIPAA*

101.    An individual's status as a plan member is protected by HIPAA.

102.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care

provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this Information would be PHI.[10]

103. In its guidance for Marketing, the Department further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients or enrollees to third parties* without obtaining authorization from each person on the list. (Emphasis added).[11]

104. The instructions continue:

For example, it is "marketing" when: . . . A health plan sells a list of its members to a company that sells blood glucose monitors, which intends to send the plan's members brochures on the benefits of purchasing and using the monitors.

105. HHS has instructed for decades that patient status – identical to plan member status – is protected by the HIPAA Privacy Rule:

a) "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b) "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere status with the covered entity, 67 Fed. Reg. 53186 (Aug. 14, 2002), such a patient or plan member list;

c) It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed.

---

[10] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Feb. 20, 2026).

[11] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Feb. 20, 2026).

Reg. 5642 (Jan. 25, 2013).

### ii. *There is no HIPAA exception for marketing on the Internet.*

100.    HHS issued a bulletin in December 2022 (the "Bulletin") "to highlight the obligations" of covered entities, such as health plans, and their business associates under the HIPAA Privacy Rule "when using online tracking technologies," such as "Google Analytics," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[12]

101.    In the Bulletin, HHS reminded covered entities that HIPAA applies to covered entities', including health plans', use of tracking technologies like the Tracking Technologies at issue here. Among other things, HHS explained that covered entities, such as health plans, violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

> *How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*
>
> Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code. In some cases, the information disclosed may meet the definition of individually identifiable health information (IIHI), which is a necessary pre-condition for information to meet the definition of PHI when it is transmitted or maintained by a regulated entity.
>
> IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of

---

[12] HHS.gov, *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

health care services. But the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care.[13]

102.    Tracking technology vendors like the Tracking Technology Vendors here are considered business associates under HIPAA if they provide services to Delta Dental and receive or maintain PHI, as they do:

Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (e.g. health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[14]

103.    HHS explained that tracking technologies on covered entities' patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

Tracking on user-authenticated webpages

Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. ***Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI***. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. ***Tracking technologies within user-authenticated webpages may even have access to an individual's***

---

[13] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.  (emphasis added)/
[14] *Id.*

***diagnosis and treatment information, prescription information, billing information, or other information within the portal***. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[15]

104.    No PHI may be disclosed to tracking technology vendors like the Tracking Technology Vendors here unless Delta Dental has properly notified its website users and entered into a business associate agreement with the vendor:

> Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use. However, the Privacy Rule does not permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures. Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.

> If there is not an applicable Privacy Rule permission or if the vendor is not a business associate of the regulated entity, then the individuals' HIPAA-compliant authorizations are required before the PHI is disclosed to the vendor. Website banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do not constitute a valid HIPAA authorization.

> Further, it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure.[16]

105.    Upon information and belief, Delta Dental does not have a BAA with the Tracking Technology Vendors that covers the disclosures at issue.

---

[15] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphases added.)

[16] *Id*.

**D.**      ***Delta Dental's HIPAA Notice of Privacy Practices & Promises.***

106.    Delta Dental publishes a Website Privacy and Security Policy that advises plan members that "To understand how your protected health information (PHI) may be used and disclosed and how you can access this information, see our HIPAA Notice of Privacy Practices."

107.    That HIPAA Notice of Privacy Practices acknowledges that Delta Dental is "required by law to maintain the privacy and security of your" PHI. Delta Dental states it may "use[] and disclos[e ] your PHI for treatment, payment or health care operations," but not marketing purposes. Indeed, Delta Dental agrees it "will obtain your authorization for the use or disclosure of PHI for marketing when required by law."

108.    Delta Dental's HIPAA Notice of Privacy Practices does ***not*** permit Delta Dental to use and disclose Plaintiff's and Class Members' Private Information for marketing purposes.

109.    Delta Dental's assurances that it will keep plan members' Private Information confidential and secure, are false.

110.    Delta Dental conceals its use of Tracking Technologies to track plan members' personally identifiable information, even when it discusses its use of internet analytical tools.

111.    Delta Dental violated its own HIPAA Notice of Privacy Practices by unlawfully intercepting and disclosing Plaintiff's and Class Members' Private Information to the Tracking Technology Vendors without adequately disclosing that Delta Dental shared Private Information with third parties and without acquiring the specific plan members' consent or authorization to share the Private Information.

**E.**      ***Plaintiff's & Class Members' Expectation of Privacy.***

112.    At all times when Plaintiff and Class Members provided their PII and PHI to Delta Dental, they each had a reasonable expectation that the information would remain private, and that

Delta Dental would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

113. Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

114. For example, a recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them. Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.

115. Users act consistent with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.

116. Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government. The same study revealed that 75% of people would abandon brands that do not take care of their data.

117. Other privacy law experts have expressed concerns about the disclosure to third parties of a users' intimate health data. For example, Dena Mendelsohn—the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs—explained that having your personal health information disseminated in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life

insurance and how much you pay for that coverage, increase the rate you're charged on loans, and leave you vulnerable to workplace discrimination.

118.    Delta Dental's surreptitious disclosure and interception of Plaintiff's and Class members' private communications, including PII, health information, and other sensitive data violates Plaintiffs' and Class members' privacy interests.

**F.  *Internet Cookies Are Personally Identifiable***

119.    In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

120.    Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's web browser and computing device when that person's web browser interacts with the website server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

121.    Cookies are designed to and, in fact, most often do operate as a means of identification for Internet users.

122.    Cookies are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

123.    Delta Dental improperly disclosed cookies along with Private Information, including cookies that contained the Google Client ID.

**G.    *IP Addresses are Personally Identifiable Information.***

124.    In addition to patient status, address, treatment, providers, and patient's unique Google ID, Delta Dental improperly disclosed plan members' computer IP addresses to the Tracking Technology Vendors through the use of the Tracking Technologies.

125.    An IP address is a number that identifies the address of a device connected to the Internet.

126.    IP addresses are used to identify and route communications on the Internet.

127.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

128.    Google also tracks IP addresses associated with Internet users.

129.    Google and other Tracking Technology Vendors track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

130.    Under HIPAA, an IP address is considered personally identifiable information:

  a.    HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

  b.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also* 45 C.F.R. § 164.514(b)(2)(i)(O).

131.    Even though an IP address could be connected to several members of the same household, it is still considered PHI. That is true, *even when the individual does not have an existing relationship with the regulated healthcare entity* since when the covered entity collects

this information through its website or mobile app, it relates to the healthcare the individual has received or will receive.[17]

132.    Consequently, Delta Dental's disclosure of plan members' IP addresses violated HIPAA and industry privacy standards.

**H.    *Plaintiff's PHI Was Used by Delta Dental Without Compensation to Plaintiff and the Class or Their Consent.***

133.    In exchange for disclosing the personally identifiable information of its plan members, Delta Dental is compensated by the Tracking Technology Vendors in the form of enhanced advertising services and more cost-efficient marketing on Google and other marketing platforms.

134.    Upon information and belief, for example, Delta Dental was advertising its services on Google, and the Google Tracking Technologies were used to help Delta Dental market on Google's platforms.

135.    Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

136.    Upon information and belief, Delta Dental re-targeted plan members and potential plan members to get more plan members to use its services.

137.    By utilizing the Tracking Technologies, the cost of advertising and retargeting was reduced, thereby benefitting Delta Dental.

138.    Through its false representations and unlawful data collection, Delta Dental is unjustly enriching itself at the cost of consumer choice, when the consumer would otherwise have the ability to choose how they would monetize their own data.

---

[17] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (last visited Feb. 20, 2026).

139. Through its false representations and unlawful data collection, Delta Dental is unjustly enriching itself based on the value of Delta Dental's unauthorized access to Plaintiff's and Class members' data and communications resulting from Delta Dental's wrongful conduct. This value is analogous to the value for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of value is appropriate here under common law principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class members have a protectible property interest in their data and communications; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

140. Plaintiff and Class members, therefore, did not receive the benefit of the bargain, which included health insurance at a fixed cost without the additional consideration of providing their personal health information without compensation to benefit Delta Dental's marketing and analytics capabilities.

### I.    *Plaintiff's and Class members' Private Information has economic value.*

141. Delta Dental and the Tracking Technology Vendors that Delta Dental uses profit from their use of Plaintiff's and Class member's personal data to target them with advertising and for other economic benefits, such as improving their internal operations.

142.    The value of personal data is well understood and generally accepted as a form of currency. The robust market for Internet user data has been analogized to the "oil" of the tech industry.[18] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[19] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

143.    The Organization for Economic Cooperation and Development ("OECD") has published numerous volumes discussing how to value data such as that which is the subject matter of this Complaint, including as early as 2013, with its publication "Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[20] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[21]

144.    In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[22] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic

---

[18]    https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

[19] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[20] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[21]    https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en

[22] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).

transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

145.   Professor Paul M. Schwartz noted in the *Harvard Law Review*:

Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[23]

146.   Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[24]

147.   As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are

---

[23] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

[24] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[25]

148.    The cash value of the personal user information unlawfully collected by Delta Dental provided during the Class Period can be quantified. For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[26] Web browsing histories were valued at $52.00 per year.



149.    Similarly, the value of user-correlated internet browsing history can be quantified, because Google Inc. was willing to pay users for similar information. Google had a panel called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add

---

[25] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf
[26] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039sy our-personal-data-worth.html.

a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet industry participants understood the enormous value in internet users' browsing habits. Google pays Screenwise panelists up to $3 per week to be tracked.

150.    User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

151.    Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."

152.    A number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies from targeting them absent their express consent:

a.      Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[27]

b.      Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[28]

c.      Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[29]

d.      Killi is a new data exchange platform that allows you to own and earn from your data.[30]

e.      Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[31]

f.      The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices

---

[27] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[28] https://loginhood.io/. *See also* https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[29] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[30] https://killi.io/earn/.

[31] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[32]

153.    Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[33]

## REPRESENTATIVE PLAINTIFF'S EXPERIENCE

154.    As a condition of using Delta Dental's services, Plaintiff Schaefer disclosed her Private Information to Delta Dental. Numerous times since she has been a plan member, Plaintiff Schaefer logged into Delta Dental's web portal from her Chrome browser on her computer and was authenticated as a plan member and accessed Delta Dental's Website to obtain her plan benefits, including searching for a dentist in her network located near her. Plaintiff Schaefer input her city and plan network as a search parameter on Delta Dental's Website, and thereafter, evaluated particular dentists as providers on dentist-specific pages. Plaintiff recalls inputting specific keywords, such as "implant," to assist her search.

---

[32] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.
[33] Kari Paul, *Google launches app that will pay users for their dat*a, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacystudy; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-datatechcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voicespeech-recognition-viewpoints-prounnunciations-app.

155.    Plaintiff Schaefer reasonably expected that her communications with Delta Dental via the Website were confidential, solely between herself and Delta Dental, and that such communications would not be transmitted to or intercepted by a third party.

156.    Plaintiff Schaefer provided her Private Information to Delta Dental and trusted that the information would be safeguarded according to Delta Dental's policies and state and federal law.

157.    As described herein, Delta Dental worked along with the Tracking Technology Vendors to intercept Plaintiff Schaefer's communications, including those that contained Private and confidential information.

158.    Delta Dental willfully facilitated these interceptions without Plaintiff Schaefer's knowledge, consent or express written authorization.

159.    Delta Dental transmitted to the Tracking Technology Vendors Plaintiff Schaefer's computer IP address, user-agent data, timestamp, city, insurance network, her status as a Delta Dental plan member, her communication with Delta Dental that she was searching for a dentist in her insurance network in her city, the type of dentist she was searching for, and the keywords she used to search, such as "implant."

160.    In addition, Delta Dental transmitted to Google Plaintiff Schaefer's Google Client ID.

161.    Plaintiff Schaefer did not consent or otherwise provide express written authorization to Delta Dental to transmit to the Tracking Technology Vendors her Private Information.

162.    By doing so without her consent, Delta Dental breached Plaintiff Schaefer's right to privacy and unlawfully disclosed Plaintiff Schaefer's Private Information.

163. Plaintiff Schaefer suffered injuries and damages in, *inter alia*, the form of (i) invasion of privacy; (ii) violation of confidentiality of her Private Information; (iii) loss of benefit of the bargain; (iv) loss of value of the Private Information; (v) violation of her legal rights and statutory damages; and (vi) the continued and ongoing risk to her Private Information.

164. Plaintiff Schaefer has a continuing interest in ensuring that her Private Information is protected and safeguarded from future unauthorized disclosure. Plaintiff Schaefer anticipates needing to use the Website to search for in-network dentists in the future.

## TOLLING

165. Any applicable statute of limitations has been tolled by the "delayed discovery" rule and/or equitable tolling. Plaintiff did not know (and had no way of knowing) that her Private Information was intercepted and unlawfully disclosed because Delta Dental kept this information secret until shortly before the filing of this complaint.

## CLASS ACTION ALLEGATIONS

166. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

167. The New York Class that Plaintiff Schaefer seeks to represent is defined as follows:

**All individuals residing in the State of New York whose Private Information was disclosed to a third party without authorization or consent through the Tracking Technologies on Delta Dental's Website.**

168. Excluded from the New York Class are Delta Dental, its agents, affiliates, parents, subsidiaries, any entity in which Delta Dental has a controlling interest, any Delta Dental officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

169.    Plaintiff reserves the right to modify or amend the definition of the proposed New York Class before the Court determines whether certification is appropriate.

170.    **Numerosity, Fed R. Civ. P. 23(a)(1)**. The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over a million individuals whose PII and PHI may have been improperly accessed by the Tracking Technology Vendors, and the Class is identifiable within Delta Dental's records. The majority of those class members are believed to be New York residents.

171.    **Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3)**. Questions of law and fact common to the New York Class exist and predominate over any questions affecting only individual Class Members. These include:

a.    Whether and to what extent Delta Dental had a duty to protect the PII and PHI of Plaintiff and Class Members;

b.    Whether Delta Dental had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

c.    Whether Delta Dental violated its HIPAA Notice of Privacy Practices by disclosing the PII and PHI of Plaintiff and Class Members to Adobe, Google, Data Dog, and Qualtrics, and/or additional third parties.

d.    Whether Delta Dental adequately, promptly and accurately informed Plaintiff and Class Members that their PII and PHI would be disclosed to third parties;

e.    Whether Delta Dental violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

f.    Whether Delta Dental adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g.     Whether Delta Dental engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

h.     Whether Delta Dental violated the consumer protection statutes invoked herein;

i.     Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Delta Dental's wrongful conduct;

j.     Whether Delta Dental knowingly made false representations in its HIPAA Notice of Privacy Practices;

k.     Whether Delta Dental knowingly omitted material representations with respect to its HIPAA Notice of Privacy Practices; and

l.     Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Delta Dental's disclosure of their PII and PHI.

172.    **Typicality, Fed. R. Civ. P. 23(a)(3)**. Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Delta Dental's use of the Tracking Technologies, due to Delta Dental's misfeasance.

173.    **Adequacy, Fed. R. Civ. P. 23(a)(4)**. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intend to prosecute this action vigorously.

174.     **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3)**. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a defendant, like Delta Dental, with significant resources. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

175.     **Policies Generally Applicable to the Class**. This class action is also appropriate for certification because Delta Dental has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Delta Dental's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Delta Dental's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

176.     The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Delta Dental would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered;

proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

177.    The litigation of the claims brought herein is manageable. Delta Dental's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

178.    **Ascertainability & Notice**. Membership in the Class can be determined by objective records maintained by Delta Dental and adequate notice can be given to Class Members directly using information maintained in Delta Dental's records.

179.    **Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2)**. Unless a Class-wide injunction is issued, Delta Dental will continue in its failure to properly secure the Private Information of Class Members, Delta Dental may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Delta Dental may continue to act unlawfully as set forth in this Complaint as Delta Dental has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

180.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Delta Dental owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

b.    Whether Delta Dental owed a legal duty to not disclose Plaintiff's and Class Members' Private Information with respect to Delta Dental's HIPAA Notice of Privacy Practices;

c.    Whether Delta Dental breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d.    Whether Delta Dental failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e.    Whether Delta Dental adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

f.    Whether Delta Dental failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

g.    Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Delta Dental's wrongful conduct.

## CLAIMS

## COUNT I

## BREACH OF CONTRACT

**(On behalf of Plaintiff & the New York Class)**

43

181. Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

182. Delta Dental required Plaintiff and Class Members to provide their Private Information, including names, location information, computer IP addresses, and other content submitted into Delta Dental's Website as a condition of their receiving health plan services.

183. As a condition of utilizing Delta Dental's digital platforms and receiving services from Delta Dental, Plaintiff and Class Members provided their Private Information and compensation for their health plan services.

184. In so doing, Plaintiff and Class Members entered into contracts with Delta Dental by which Delta Dental agreed to safeguard and protect such information, including in its HIPAA Notice of Privacy Practices.

185. Delta Dental's relevant HIPAA Notice of Privacy Practices and representations require it to take appropriate steps to safeguard the Private Information entrusted to it by the Plaintiff and Class Members.

186. In particular, Delta Dental's HIPAA Notice of Privacy Practices acknowledges that Delta Dental is "required by law to maintain the privacy and security of your" PHI. Delta Dental states it may "use[] and disclos[e ] your PHI for treatment, payment or health care operations," but not marketing purposes. Indeed, Delta Dental agrees it "will obtain your authorization for the use or disclosure of PHI for marketing when required by law."

187. Plaintiff and Class Members fully performed their obligations under the contract with Delta Dental.

188. Delta Dental breached these agreements, which directly and/or proximately caused Plaintiff and Class Members to suffer damages, including nominal damages.

189.    Delta Dental breached the contracts it made with Plaintiff and Class Members by failing to obtain proper authorization for the use or disclosure of PHI for marketing as required by HIPAA.

190.    As a direct and proximate result of Delta Dental's above-described breach of contract, Plaintiff and Class Members have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

191.    As a direct and proximate result of Delta Dental's above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT II

## BREACH OF CONFIDENCE

### (On behalf of Plaintiff & the New York Class)

192.    Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

193.    Health plans have a duty to their plan members to keep non-public medical information confidential.

194.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Delta Dental, including communications exchanged on Delta Dental's Website, which were further buttressed by Delta Dental's express promises in its HIPAA Notice of Privacy Practices.

195.    Contrary to its duties as a health plan and its express promises of confidentiality, Delta Dental installed the Tracking Technologies to disclose and to transmit to third parties Plaintiff's and Class Members' communications with Delta Dental including Private Information and the contents of such information.

45

196. These disclosures were made without Plaintiff's or other Class Members' knowledge, consent or authorization.

197. The third-party recipients included, but were not limited to, Adobe, Google, Datadog, and Qualtrics.

198. The harm arising from a breach of health plan-patient confidentiality includes erosion of the essential confidential relationship between the health plan and the patient.

199. As a direct and proximate cause of Delta Dental's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Delta Dental's breach in that:

    a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

    b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c. Delta Dental eroded the essential confidential nature of the health plan-patient relationship;

    d. Delta Dental took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

    e. Plaintiff and Class Members did not get the full value of the health plan services for which they paid, which included Delta Dental's duty to maintain confidentiality;

    f. Delta Dental's actions diminished the value of Plaintiff's and Class Members' Private Information; and

g.    Delta Dental's actions violated the property rights Plaintiff and Class Members have in their Private Information.

## COUNT III

## VIOLATION OF THE NEW YORK DECEPTIVE TRADE PRACTICES ACT

### New York Gen. Bus. Law § 349, *et seq.*

### (On Behalf of Plaintiff & the New York Class)

200.    Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

201.    By the acts and conduct alleged herein, Delta Dental committed unfair or deceptive acts and practices by:

a.    promising to maintain the privacy and security of Plaintiff's and Class Members' protected health information as required by law;

b.    installing the Tracking Technologies to operate as intended and transmit Plaintiff's and Class Members' Private Information without their authorization to the Tracking Technology Vendors;

c.    failing to disclose or omitting material facts to Plaintiff and Class Members regarding the disclosure of their Private Information to the Tracking Technology Vendors;

d.    failing to take proper action to ensure the Tracking Technologies were configured to prevent unlawful disclosure of Plaintiff's and Class Members' Private Information;

e.    unlawfully disclosing Plaintiff's and Class Members' Private Information to the Tracking Technology Vendors.

202.    These unfair acts and practices violated duties imposed by laws, including but not limited to, the Federal Trade Commission Act, HIPAA and NY GBL § 349.

203.    Delta Dental's actions also constitute deceptive and unfair acts or practices because Delta Dental knew it failed to disclose to Plaintiff and Class Members that their healthcare related communications via the Website would be disclosed to the Tracking Technology Vendors.

204.    Delta Dental's actions also constitute deceptive and unfair acts or practices because Delta Dental intended that Plaintiff and Class Members rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Delta Dental's offering of goods and services.

205.    Specifically, Delta Dental was aware that Plaintiff and Class Members depended and relied upon it to keep their communications confidential, and Delta Dental instead disclosed that information to the Tracking Technology Vendors.

206.    In addition, Delta Dental's material failure to disclose that Delta Dental collects Plaintiff's and Class Members' Private Information for marketing purposes with the Tracking Technology Vendors constitutes an unfair act or practice prohibited by the NY GBL § 349. Delta Dental's actions were immoral, unethical, and unscrupulous.

207.    Plaintiff had reasonable expectations of privacy in their communications exchanged with Delta Dental, including communications exchanged at https://www1.deltadentalins.com/.

208.    Plaintiff's reasonable expectations of privacy in the communications exchanged with Delta Dental were further buttressed by Delta Dental's express promises in its HIPAA Notice of Privacy Practices and Website Privacy and Security Policy.

209.    Contrary to its duties as a health plan and its express promises of confidentiality, Delta Dental deployed the Tracking Technologies to disclose and transmit Plaintiff's personally

identifiable, non-public medical information, and the contents of her communications exchanged with Delta Dental to third parties, *i.e.*, the Tracking Technology Vendors.

210. Delta Dental's disclosures of Plaintiff's and Class Members' Private Information were made without their knowledge, consent, or authorization, and were unprivileged.

211. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the health plan and the patient.

212. Delta Dental willfully, knowingly, intentionally, and voluntarily engaged in the aforementioned acts when it incorporated the Tracking Technologies with knowledge of the Tracking Technologies' purpose and functionality.

213. The harm described herein could not have been avoided by Plaintiff and Class Members through the exercise of ordinary diligence.

214. As a result of Delta Dental's wrongful conduct, Plaintiff were injured in that they never would have provided their PII and PHI to Delta Dental, or purchased Delta Dental's services, had they known or been told that Delta Dental shared their confidential and sensitive Private Information with the Tracking Technology Vendors.

215. As a direct and proximate result of Delta Dental's multiple, separate violations of the NY GBL § 349, Plaintiff and Class Member have suffered harm, including financial losses related to the payments or services made to Delta Dental that Plaintiff and Class Members would not have made had they known of Delta Dental's disclosure of their PII and PHI to the Tracking Technology Vendors; lost control over the value of their PII and PHI; and other harm resulting from the unauthorized use or threat of unauthorized use of their PII and PHI, including for unwanted solicitations or marketing, entitling them to damages in an amount to be proven at trial.

216. Delta Dental's acts, practices and omissions were done in the course of Delta Dental's business of furnishing healthcare-related services to consumers in the State of New York.

217.    Plaintiff bring this action on behalf of herself and Class Members for the relief requested above and for the public benefit to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members and the public from Delta Dental's unfair, deceptive and unlawful practices. Delta Dental's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

218.    As a result, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorneys' fees incurred in this action.

## COUNT IV

## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 350

### (On Behalf of Plaintiff and the New York Class)

219.    Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

220.    Delta Dental was and is engaged in "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

221.    The New York False Advertising Act ("New York FAA") prohibits "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.

222.    In marketing its health insurance products to consumers, Delta Dental's Website touts its commitment to plan member privacy in its a Website Privacy and Security Policy and its HIPAA Notice of Privacy Practices. Each document is prominently linked on pages throughout the Website, and is available for review by any consumer considering purchasing health insurance from Delta Dental.

223.    Delta Dental's Website Privacy and Security Policy that advises plan members that "To understand how your protected health information (PHI) may be used and disclosed and how you can access this information, see our HIPAA Notice of Privacy Practices."

224.    That HIPAA Notice of Privacy Practices acknowledges that Delta Dental is "required by law to maintain the privacy and security of your" PHI. Delta Dental states it may "use[] and disclos[e ] your PHI for treatment, payment or health care operations," but not marketing purposes. Indeed, Delta Dental agrees it "will obtain your authorization for the use or disclosure of PHI for marketing when required by law."

225.    Delta Dental's HIPAA Notice of Privacy Practices does **not** permit Delta Dental to use and disclose Plaintiff's and Class Members' Private Information for marketing purposes.

226.    Delta Dental's assurances that it will keep plan members' Private Information confidential and secure, are false.

227.    Delta Dental's practices, as described throughout the complaint, harm the public at large in a material way by misleading consumers who purchase health insurance from Delta Dental.

228.    Delta Dental caused to be made or disseminated through New York statements that were untrue or misleading, and which were known, or which by exercise of reasonable care should have been known by them, to be untrue and misleading to consumers, including Plaintiff and members of the New York Class.

229.    In the course of their business, Delta Dental, through their agents, employees, and/or subsidiaries, violated the New York FAA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the disclosure of plan member PHI as described throughout the complaint.

230.    By misrepresenting its treatment of consumers PHI, Delta Dental led consumers to believe they could purchase health insurance at a fixed cost *without* the additional consideration of providing their PHI for Delta Dental's marketing and analytics use.

231.    As a direct and proximate result of Delta Dental's conduct, Plaintiff and members of the New York Purchaser Class have sustained economic injury and loss by providing more consideration to health insurance provider than was bargained for.

232.    ITN's unlawful acts and practices complained of herein affect the public interest.

233.    Pursuant to N.Y. Gen. Bus. Law § 350, Plaintiff and members of the New York Class seek an order enjoining the above acts or practices and awarding actual or statutory damages, punitive damages, and any other just and proper relief available under the New York FAA.

## COUNT V

## VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")

## 18 U.S.C. § 2511(1) *et seq.*

## UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE

### (On Behalf of Plaintiff & the New York Class)

234.    Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

235.    The ECPA protects both sending and receipt of communications.

236.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

237.    The transmissions of Plaintiff's PII and PHI to Delta Dental's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

238.    Electronic Communications. The transmission of PII and PHI between Plaintiff and Class Members and Delta Dental's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

239.    Content. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

240.    Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

241.    Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

      a.    Plaintiff's and Class Members' browsers;

      b.    Plaintiff's and Class Members' computing devices (including mobile devices);

      c.    Delta Dental's web-servers;

      d.    Delta Dental's Website; and

      e.    The Tracking Technology codes deployed by Delta Dental to effectuate the sending and acquisition of patient communications.

242.    By utilizing and embedding the Tracking Technologies on its Website, Delta Dental intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

243.    Specifically, Delta Dental intercepted Plaintiff's and Class Members' electronic communications via the Tracking Technologies, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' PII to the Tracking Technology Vendors.

244.    Delta Dental's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding PII and PHI, such as treatment, location, and dentists.

245.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Delta Dental violated 18 U.S.C. § 2511(1)(c).

246.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Delta Dental violated 18 U.S.C. § 2511(1)(d).

247.    Unauthorized Purpose. Delta Dental intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

248.    Delta Dental intentionally used the wire or electronic communications to increase its profit margins. Delta Dental specifically used the Tracking Technologies to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

249.    Delta Dental was not acting under color of law to intercept Plaintiff and Class Member's wire or electronic communication.

250.    Plaintiff and Class Members did not authorize Delta Dental to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Tracking Technologies tracking codes.

251.    Any purported consent that Delta Dental received from Plaintiff and Class Members was not valid.

252.    In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Delta Dental's Website, Delta Dental's purpose was tortious, criminal, and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (ii) violation of NY GBL § 349.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Elizabeth Schaefer respectfully prays for judgment in her favor and against Delta Dental of New York, Inc. and Delta Dental of California as follows:

A. For an Order certifying this action as a Class action and appointing Plaintiff as Class Representatives and Plaintiff's counsel as Class Counsel;

B. For equitable relief enjoining Delta Dental from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. For equitable relief compelling Delta Dental to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Delta Dental's wrongful conduct;

E. For an award of nominal damages, actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

F. For an award of punitive damages, as allowable by law;

G. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

H. Pre- and post-judgment interest on any amounts awarded; and

I. Such other and further relief as this Honorable Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Elizabeth Schaefer hereby demands that this matter be tried to a jury.

Dated: March 16, 2026                                DWOSKIN WASDIN LLP

                                                             s/ Eric S. Dwoskin
                                                             Eric S. Dwoskin
                                                             433 Plaza Real, Suite 275
                                                             Boca Raton, FL 33432
                                                             Tel.: (561) 849-8060
                                                             edwoskin@dwowas.com

                                                             *Attorney for Plaintiff and the putative Class*